THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND, APPELLANTS, VS. WILLIAM H. GLEASON, RESPONDENT.

1. A court of equity will decree performance by a trustee of a contract, when such contract conforms to the law of his trust and his duty as to the improvement of the trust property, and where there is performance by the party with whom the contract is made.
2. Where the specific performance of such a contract is sought, affecting to a great extent the interests of the *cestuis que trust*, they should be parties to the suit.
3. Under the provisions of the Internal Improvement law of this State, it is the duty of the Trustees of the Fund to make such arrangements for the drainage of the swamp and overflowed lands as is most advantageous to the fund.

Appeal from Duval Circuit Court, Fourth Judicial Circuit.

The Trustees of the Internal Improvement Fund, on the 4th of February, A. D. 1869, contracted with W. H. Gleason to ditch and drain certain swamp and overflowed lands in the State of Florida, agreeing that whenever he should open or dig ditches or drains containing fifty thousand feet, cubic measure, and should make to the board a certificate of

the fact, under oath, attested by the county surveyor or a magistrate, duly qualified, of the county where such ditches or drains are located, and furnish such other testimony of the facts as might thereafter be required by the board, the said Gleason, or his legal representatives, should be allowed to purchase from the State lands within the limits above prescribed; and the board would sell and convey to the said Gleason all the interest which they have or may have to six hundred and forty acres of said swamp and over-flowed lands, for each and every fifty thousand cubic feet so certified, from time to time, upon payment of the sum of forty dollars per each six hundred and forty acres of land so purchased. The parties then made other stipulations, which it is unnecessary to mention.

Gleason now brings this bill against the trustees, alleging that he has dug a ditch containing three hundred thousand cubic feet, in township 42, range 43 east; that said ditch is of the character agreed upon; that it was necessary for the drainage of the lands in the vicinity; that it has actually drained and reclaimed them; that he has offered and tendered to the trustees the sum of two hundred and forty dollars, and requested a conveyance of lands agreed to be conveyed under the contract, *and that said trustees admit that he has performed his contract*, and decline and refuse to perform their contract, upon the sole ground that they had no power or authority to make the said contract. To this bill the defendants interposed a demurrer, alleging generally a want of equity, which, upon a hearing, is overruled. From this judgment they appeal.

*H. Bisbee, Jr.*, for Appellants.

The appellants insist that the case of Bailey vs. Trustees, 10 Fla., 112, has settled the following three legal propositions, to-wit:

1. That the act of 1855 creating said trustees is constitu-

tional, and that the trustees must execute their trust as specified in said act.

2. That a holder of one of the internal improvement bonds has the right to have said lands applied to pay the interest on said bonds until the same is paid.

3. That when the trustees are applying said land for other purposes, a holder of a bond has a right to an injunction to restrain the misappropriation.

It follows, as a matter of course, that the Supreme Court having adjudged that such are the rights of the bondholders, the trustees are bound to protect and assert such rights, to the exclusion of all claims hostile thereto.

Thus this court has laid down the law, and the appellants must be guided by it. *It is plain that the appropriating the lands to dig a ditch is not applying them or their proceeds to pay interest on bonds.*

We cannot look to the consequences of such a construction of the law. It may arrest every effort at internal improvement, however wise or advantageous. It may render impossible every noble enterprise to develop the resources of the State; stifle every industry, repel capital and labor from our shores, until all the industries of the State shall perish.

The consequences of the law can never be considered in passing a judgment of what the law of a given subject is.

It may be argued that the act of 1855 is repugnant to the proviso in the second section of the act of Congress granting the swamp and overflowed lands to the State, which provides that the lands or their proceeds shall be applied exclusively to reclamation by means of levees and drains, and therefore unconstitutional and void.

It may be argued by the complainant that his rights under the contract are consistent with the act of Congress, and that his contract is in effect carrying out the act of Congress.

Our answer to this is, that the words of the act of Con-

gress are those of a present grant, which passes the fee to the State. Besides, the law provides for a patent to issue to the State. That the fee having passed to the State, the State can do as they please with the lands, and consequently apply the same to pay interest on railroad bonds.

The general government cannot control the disposition of the land after granting the title to the State; it cannot impose a restriction upon the power of alienation. Such a proviso is repugnant to the nature of the estate granted, to-wit, the fee, and therefore void. 4 Kent Com., 130–1; 1, Denio, 448; 14 Wend., 348; 16 Wend., 320; 1 John. C. R., 220; 15 Ga., 103.

"It is a settled rule that when a proviso to a grant is re-pugnant to the grant itself, the grant is good and the pro-viso is void." 3 Wall., J. C. C., cited in Brightly's Federal Digest, 816.

There is no doubt the law of these authorities applies to this case, and that the proviso restricting the disposal of the land by the State is void.

"Words of present grant pass the fee." 13 Pet., 499; 6 Pet., 677, 328.

If, then, the proviso in the grant is void, the State had the right to appropriate the lands to pay interest on rail-road bonds. This court has said that they have been ap-plied to this purpose, and until the interest on such bonds is entirely paid, they cannot be appropriated to other pur-poses. The Gleason contract being for other purposes, such contract is illegal, and consequently the complainants have no equity. This is the end of the matter.

*D. P. Holland* of counsel for Appellee.

It is contended on behalf of the appellee—

1. That the said act of Congress of September 28, 1850, formed a contract between the United States on the accept-ance of the same by the State of Florida, and that the con-tract required the State to appropriate the lands granted to

the purpose, of reclaiming them.    Statutes at Large, Vol. 9, p. 519.

This act of Congress has been construed by the Supreme Court of the United States in McGee vs. Mathis, 4 Wallace,. 155.    The Chief Justice, delivering the opinion of the court, said:

"It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract.    All the elements of a contract met in the transaction—competent parties, proper subject matter, sufficient consideration and the consent of minds.

" The contract was binding upon the State, and could not be violated by its legislation without infringement of the constitution.

" The contract required the State to appropriate the lands granted to the purpose of reclaiming them."

This decision was made in December term, A. D. 1866, of the Supreme Court of the United States, and being the interpretation of an act of Congress, we respectfully contend is binding on this court and overrules the authority of the case of Trustees of the Internal Improvement Fund vs. William Bailey, 10 Fla. R., 112, 125.

It is evident that an appeal could have been taken from the decisions of the Supreme Court of Florida in the said case of Bailey to the Supreme Court of the United States,. as that case involved the construction of an act of Congress, and that the decision of the said Supreme Court of the United States, if an appeal had been taken, would have been binding upon this court and upon the parties to the suit.

Therefore we hold that by the case in 4 Wallace above quoted, it has been adjudicated that the said act of Congress. of September 28, 1850, formed a contract between the State of Florida and the United States, and that this contract was binding upon the State and could not be vitiated by its legislation without infringement of the constitution, and

that the contract required the State to appropriate the lands granted, and further, that in the language of the Supreme Court of the United States, "the lands themselves might be conveyed to the levee contractor for work performed, or the contractor might be paid in money or scrip representing land."

II. That the State of Florida, by said statute of 1855, recognized the contract aforesaid, and provided the machinery for the execution of said contract and for the reclamation of the swamp and overflowed lands, and made it mandatory upon said trustees to provide for the drainage of the same.

It is contended that the State of Florida in the 16th Section of the said act of 1855, in the following words, "and make such arrangements for the drainage of the swamp or overflowed lands as in their judgment may be most advantageous to the Internal Improvement Fund, and the settlement and cultivation of the land," thereby applied by legislation the whole of the swamp or overflowed lands and their proceeds to the purpose of reclaiming them, and that it was and is the duty of the trustees to provide for their drainage by making such arrangements therefor as in their judgment may be most advantageous to the fund.

2. That any other application by the trustees of said swamp and overflowed lands and their proceeds than to the aforesaid purpose of drainage, is in direct violation of said act of Congress of 1850 and of the statute of the State of 1855, and a direct and palpable violation of their duties as such trustees, and especially of the duty imposed on them by said 16th section of said statute.

3. That all these lands, called the swamp and overflowed lands, became the property of the State by virtue of said act of Congress of 1850, and without any further act or thing required or remaining to be done by any officer or department of the United States. This view of the rights of the State is sustained by the Supreme Court of the United.

States in the case of Railroad Company vs. Smith, 9 Wallace, 99. In that case it was contended that because the Secretary of the Interior had not furnished the State with the lists of the swamp and overflowed lands within the State, no title had passed to the State, but Mr. Justice Miller, delivering the opinion of the court, said, "by the second section of the act of 1850 it was made the duty of the Secretary of the Interior to ascertain the fact and furnish the State with the evidence of it. Must the State lose the land, though clearly swamp land, because that officer has neglected to do this? The right of the State did not depend on his action, but on the act of Congress, and though the State might be embarrassed in the assertion of this right by the delay or failure of the Secretary to ascertain and make out lists of these lands, the right of the States to them could not be defeated by that delay.

4. It appears by the pleadings in this suit that there now remains of said swamp lands about fourteen millions of acres unsold, which vast domain derived by said act of Congress and by the statute of 1855, we contend, the trustees now hold for the exclusive purpose of reclaiming them by drainage, for which purpose the State of Florida prescribed the duties and vested ample power in said trustees.

III. That the contracts made by the trustees with Gleason for the drainage of the swamp lands were in the power and discretion of the trustees and in accordance with the true intent and meaning of the statute of 1855, and the duties imposed on the trustees by the said 16th section of the statute which created the trust.

It is too plain for argument, that if the said contracts were valid, the present Board of Trustees cannot, without violation of the said statute and of the Constitution of the United States, impair the obligation of the contracts.

It is not denied that these contracts were made and executed by and between the contracting parties, the trustees on the one part and Gleason on the other.

It is further admitted, that in accordance with the provisions of said contract, Gleason dug a canal in T. 42, R. 43 east, which was 300 feet long, 200 feet wide and five feet average depth; and thereby connecting Lake Worth with the Atlantic Ocean, and reclaimed about 4,000 acres of the swamp or overflowed lands in the vicinity of the lake and canal. That under this contract he was entitled to receive deeds for six sections of land on paying the trustees two hundred and forty dollars. That he made the demand and tendered payment, but was refused by the trustees, who declared the said contracts null and void; because the defendants say they are " now advised that (they) have no power to appropriate any of the lands belonging to the Internal Improvement Fund for the purpose of drainage, or for any other purpose except for the prosecution of the works of internal improvement specially designated in an act to encourage a liberal system of internal improvements in the State, approved A. D. 1855, or to pay obligations already contracted in behalf of said improvements, and that the said contracts are null and void."

The defendants, it is supposed, predicated their action on the opinion in the Bailey case in 10 Florida. But we respectfully say that the said opinion has never received the sanction of the State of Florida, but, upon the contrary, we find that a statute was passed by the Legislature of Florida instructing the Attorney-General of the State "to file an application before the Supreme Court for a re-hearing in the case of the Trustees of the Internal Improvement Fund vs. William Bailey before a competent tribunal or by bill or otherwise to be filed by him, shall come before a competent tribunal to have the question in the above case settled and the questions arising out of this act in regard to the Indian River Canal." See Laws of Florida, 8th section, act approved December 10, 1862, chapter 1359, 35. By reference to the case of the Trustees vs. Bailey, 10 Fla., 214, it will be perceived that the Attorney-General did make said

application and was refused, the court deciding that the judges who sat in said case were competent to hear and determine said case, and at pages 247 to 258 will be found the opinion of the court dismissing the application upon the ground that the said section of said act of 1862 was unconstitutional.

Thus we perceive that this case of Bailey was attempted to be opened and re-heard, and so dissatisfied was the State with the decision therein that a statute was passed for that purpose, and the law officer of the government instituted proceedings therefor, which were refused by the court who had made the decision; the same judges deciding as to their own eligibility, and the constitutionality of the statute which expressed the dissatisfaction of the law-making power with the decision rendered in that case, whereby this vast public domain was wrested from the objects to which it was granted by Congress and by the statute of 1855, vested in the trustees, to wit: reclamation and drainage, and attempted by that decision to be applied exclusively to aid in the construction of certain lines of railway.

But it is respectfully contended that the Legislature of Florida did not vest the lands derived from these two grants in said trustees to be applied exclusively to the construction of the lines of railway designated in the 4th section of the statute; the last clause of said section uses the following words: " are proper improvements *to be aided* from the Internal Improvement Fund in manner as hereinafter provided." If the construction given by the trustees to this statute was the correct one, such would not have been the language of the Legislature as quoted above; but the statute would have read, shall be first constructed before the Internal Improvement Fund or any part thereof shall be applied to any other object of drainage, or otherwise in this act provided for.

But instead of this being the language of the act, the Legislature declared a particular line of railways, and then

declared that they "are proper improvements to be aided from the Internal Improvement Fund," while the trustees, following the authority in the case of Bailey, say that they are the *exclusive* improvements, for whose construction and benefit the whole Internal Improvement Fund was created. Such a construction we hold cannot be gathered from the true intent and meaning of this statute, more especially as the 16th section in peremptory language declares that the Trustees *shall* make such arrangements for the drainage of the swamp or overflowed lands, as, in their judgment, may be most advantageous to the Internal Improvement Fund; nor will any court give a construction to a statute which will declare the same to be unconstitutional if the statute is capable of being otherwise interpreted, and it is evident that the Legislature, in the 16th section, provided the means through a Board of Trustees for the reclamation of those lands by drainage, in accordance with the contract between the State and the United States, as by the Supreme Court of the United States in the case of 4th Wallace, is laid down to be the true interpretation of the act of Congress of 1850.

Again, we contend that this statute of 1855 will be found to contain the following objects for which this fund should be used by the trustees : first, the statute said that a line of railway ; and second, a particular canal described in the 4th section, were proper improvements to be aided from the fund ; third, that the swamp and overflowed lands should be used for drainage of the same for the purpose of their settlement and cultivation ; fourth, for the encouragement of actual settlement and cultivation of said lands, and to accomplish this last purpose the trustees were authorized to prescribe rules and regulations, having reference to pre-emptions, granting a portion of said lands therefor, limited, however, to not more than one section of land to any one settler, and we hold that while the first two objects of the statute were confined to the five hundred thousand acres,

the balance of the fund, to wit : all the swamp or overflowed
lands, were to be applied by the Trustees as in the 16th
section is provided, to the other two objects, the primary
object being that of drainage.

But as to the five hundred thousand acres, these lands
were derived from an act entitled "an act to appropriate
the proceeds of the sales of the public lands, and to grant
pre-emption rights," approved September 4, 1841. The 8th
section said, " and be it further enacted, that there shall be
granted to each State specified in the 1st section of this act,
five hundred thousand acres of land for the purposes of in-
ternal improvement ;" then follows the proviso relative to
the grant to these States, and then, at the end of the sec-
tion, we find the clause or language by which the State of
Florida obtained the aforesaid five hundred thousand acres
mentioned in the bill, which part of said section 8 is in the
following words :

"And there shall be, and hereby is, granted to each new
State that shall be hereafter admitted into the Union, upon
such admission, so much land as, including such quantity as
may have been granted to such State before its admission,
and while under a Territorial Government, for purposes of
internal improvement as aforesaid, as shall make five hun-
dred thousand acres of land, to be selected and located as
aforesaid."

Congress providing in the 9th section that these lands
should not be sold for less than $1.25 per acre, and provided
that the net proceeds of the sale of said lands should be
faithfully applied to objects of internal improvement within
the State, and in said section designated such objects, to
wit : roads, railways, bridges, canals and improvements of
water-courses and drainage of swamps, and further provided
that when they were made or improved they should be free
for the transportation of the United States mail and muni-
tions of war, and for the passage of their troops without the

payment of any toll whatever, which section will be found at page 445, volume 5 U. S. Statutes at Large, as follows :

"Sec. 9. *And be it further enacted*, That the lands herein granted to the States above named shall not be disposed of at a price less than one dollar and twenty-five cents per acre, until otherwise authorized by a law of the United States ; and the net proceeds of the sales of said lands shall be faithfully applied to objects of internal improvement within the States aforesaid, respectively, namely: Roads, railways, bridges, canals and improvement of water-courses, and draining of swamps; and such roads, railways, canals, bridges and water-courses, when made or improved, shall be free for the transportation of the United States mail and munitions of war, and for the passage of their troops, without the payment of any toll whatever."

It is apparent that as to the lands granted to the State of Florida under this act of Congress of 1841, the State had full power to apply the net proceeds of the sales of said five hundred thousand acres to the construction of the lines of railway and the canal designated in the act of 1855, but as before shown, the swamp or overflowed lands were not granted to the State until nine years thereafter, and that for a different purpose and sole object, to wit: reclaiming them, and we hold that there would be just as much power in the State of Florida to apply the Seminary and School lands granted to the State by the act of March 3, 1845, or any of the following lands, which were by said act of Congress, granted to the State as we find in the first section of said act, to wit: eight sections for the seat of government, the 16th section in every township for the support of public schools ; also two additional townships for seminaries of learning, and five per cent. of the public lands within the State for the purpose of education. See page 788, volume 5, U. S. Statutes at Large, Sec. 1, Act March 3, 1845, to the purpose of constructing railroads or canals, or to attempt to divert the swamp or overflowed land from the purpose of

drainage to the construction of lines of railway, unless it can be made to appear to the satisfaction of this court that railroads are constructed for the purpose of drainage of overflowed lands instead of for the carrying of freight and passengers, and that the line of railway designated in the 4th section of the act of 1855 was to be constructed for the purpose of draining the swamp and overflowed land granted in 1850 to the State of Florida by the Congress of the United States for the purpose " of reclaiming them."

The Supreme Court of the United States, charged by the Constitution with the interpretation of acts of Congress, having decided that said act of 1850 constituted a contract between the State accepting the act and the United States, we deem it unnecessary to cite further authority to show what said act of Congress is, or to attempt to interpret it, for it is too well established to admit of denial that when propositions are offered by one State and agreed to and accepted by another, they constitute a compact between them.

IV. That even if the foregoing positions are wrong, yet, nevertheless, the present trustees ought, in good faith, to carry out on their part the contracts set forth in the bill made with Gleason by their predecessors.

Because it appears from the pleadings that while there had been issued $3,502,860 of railroad bonds under the act of 1855, for the *interest* on which the fund was liable, yet there now remains outstanding but the sum of $696,000 of bonds, for the interest on which last sum the fund is now only liable, the balance having been redeemed or cancelled; and we hold it were a strange interpretation to give to this statute that the drainage of the swamp or overflowed land, and all other work of internal improvement, should fail to receive any assistance by this act, or the fund by it provided, until the last coupon of the last bond issued under said act had been paid; yet such is the construction given by the trustees to this statute by the resolution passed by

them, which declares that the contracts of their predecessors made with Gleason are nullities.

V. The pleadings further show that, unless restrained by the decretal order prayed for in the bill, they will dispose of the lands designated in the contract to the utter annihilation of the rights of Gleason.

And we hold that, although the defendants are public functionaries who are exercising a public trust, a court of equity will interfere where they are departing from the power which the law vested in them, and that the court will treat them merely as persons dealing with property without legal authority. 2 Story, Eq. Juris., Sec. 955. And that court of equity will interfere by injunction to prevent the sales of real estate, as to restraining the vendor from selling, to the prejudice of the vendee, pending a bill for the specific performance of a contract respecting an estate. 2 Story, Eq. Juris., Sec. 953; 16 Ves., 267.

In this case the power of specific performance is within the scope of the duties of the trustees; the discretion vested in them by the act has been performed by their predecessors. They do not deny the reasonableness of the contract, the benefit to the fund to be derived therefrom, nor that Gleason has performed the contract on his part; but, upon the contrary, the same is admitted, and the defendants undertake to declare the said contracts void upon an interpretation which they are advised the statute warrants them in so doing; and we submit that, in such a case as here presented, a court of equity will grant the relief prayed for in complainant's bill, and that the decree of the Chancellor of the Fourth Circuit should be affirmed.

WESTCOTT, J., delivered the opinion of the court.

The appellants have alleged that the contract set up in the bill is illegal and void, is beyond their power as trustees, and that a court of equity will not decree performance upon their part. A trustee, who comes into a court of

equity alleging want of power and illegality in his contracts in reference to the trust committed to his care, and who asks a court, for this reason, to deny relief to a party who alleges performance upon his part, occupies a position which cannot be commended. The trustee, however, is yet to be heard from, and his answer may explain all the circumstances. In such a case the specific performance might perhaps be denied, in the interests and in behalf of the *cestuis que trust*, and the party left to such a remedy against the property of the trustees as the laws afforded him, if any.

But is it true that the contract here is *ultra vires*, as to the trustees ? Under the provisions of the act of January 6, 1855, all the swamp and overflowed lands granted to this State by the Federal Government, and the proceeds to be realized from sales thereof, were, with what is known as the internal improvement lands, set apart and declared a distinct and separate fund, called the Internal Improvement Fund.

These lands were vested in five trustees. The duties of the trustees as to the management and investment of the trust fund were prescribed, and certain improvements were designated as proper to be aided from the fund, and the manner of extending such aid was indicated in the act. In regulating the manner in which this trust estate should be administered, and directing the means through which the land was to be made useful to the fund, the law required that the price of the saleable lands should be fixed with reference to their location and value, and that, as to the swamp and overflowed lands, they should make such arrangements for their drainage as, in their judgment, was most advantageous to the Internal Improvement Fund, and the settlement and cultivation of the land. These swamp lands, therefore, are a trust estate, and it is the duty of the trustees, under this act, to improve the trust property by drainage. The error of the defence here made by the trustees is the conception that a contract to improve the trust

estate, by using a portion of it to render the balance more
valuable, in a manner authorized by the act—in other
words, using a portion of the fund, or a part of the land
itself, to make the other of more advantage—is a violation
of the trust. The construction contended for would render
these trustees powerless to drain one acre of the millions of
acres of swamp lands now in their hands, thus preventing
their improvement, and would prevent them from carrying
out the manifest policy and spirit of the law upon the sub-
ject. As a matter of course, the interest of the *cestuis que
trust* are not to be disregarded in this matter, nor is the
simple *element of drainage* in a contract enough to secure
its approval and enforcement by a court of equity. The
performance of this contract involves, so far as appears from
the face of the bill, no diversion of the trust fund. It is
its simple improvement in a manner authorized by the law
of the trust. As the case now stands, we must presume
that the contract is advantageous to the fund. Our atten-
tion has been called to the case of Bailey vs. The Trustees,
10 Fla., p. 112, and it has been contended that the matter
there decided covers this case. This, we think, is incorrect.
In that case the trustees sought to appropriate the fund to
deepening the channel of a river. That is the case stated
by the Justice delivering the opinion. The deepening of
the channel of this river was nowhere declared to be a
proper improvement to be aided by the fund, and the court
enjoined such a use of the fund.

In this case the court should not proceed further without
requiring the *cestuis que trust* to be made parties. Where
trustees enter into contract in their character as trustees,
and in behalf of the trust estate, and for the benefit of the
*cestuis que trust*, the *cestuis que trust* for whose benefit the
contract was made ought to be parties to the suit. (Perry
on Trusts, § 874; Story's Eq. Plds., § 208.)

There are perhaps exceptions to this rule, as originally
announced by Sir John Leach, but we think the presence

of the *cestuis que trust* here .is advisable and necessary. The trustee here apparently assumes an attitude hostile to the *cestuis que trust*, and it is best that they should be heard as to their rights.

The judgment upon the demurrer is affirmed, and the case is remanded for further proceedings not inconsistent with this opinion and conformable to law.